UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:19-CV-677-RGJ

MOHR PARTNERS, INC.                                                          Plaintiff

v.

CBRE GROUP, INC.                                                          Defendant

* * * * *

## MEMORANDUM OPINION AND ORDER

Defendant CBRE Group Inc. ("CBRE") moves to dismiss Plaintiff Mohr Partners, Inc.'s ("Mohr") Complaint. [DE 12]. Briefing is complete and the matter is ripe. [DE 14; DE 15; DE 23]. For the reasons below, CBRE's Motion to Dismiss is **DENIED**.

## I.        BACKGROUND

In early 2018, Mohr, a commercial real estate company, "entered into an exclusive services agreement ("Services Agreement)" with APL Logistics Americas, Ltd. ("APL"). [DE 1 at 2-3]. Under the terms of the Services Agreement, Mohr agreed to locate and negotiate leases on behalf of APL and its clients. *Id.* at 3. The Dow Chemical Company ("Dow") is one of APL's clients. *Id.* Beginning in March 2018, Mohr began looking for and ultimately found a large industrial space in Shepherdsville, Kentucky that fit Dow's needs (the "Premises"). *Id.* Prologis NA2 RPP Kentucky, LLC ("Prologis") owned the Premises. *Id.*

Mohr began negotiating with Prologis for the lease of the Premises. *Id.* at 4. The parties intended for "APL to be the named tenant on the lease" and for Dow to "guaranty the tenant improvement concessions under the lease and . . . occupy the Premises." *Id.* During negotiations, CBRE, another brokerage firm, represented Prologis. *Id.* As tenant broker for APL, Mohr would be "entitled to a commission from Prologis if it was successful in procuring a tenant that was ready,

willing, and able to perform, *i.e.* to lease the Premises on agreed upon terms. As is industry standard, custom, and practice, and pursuant to written documents exchanged between Prologis, CBRE, and Mohr, the real estate brokerage commission would be paid to Mohr by Prologis – the Landlord." *Id.*

Over the next eight months, Mohr "expended substantial efforts" negotiating the lease of the Premises by: 1) travelling to Kentucky to negotiate the material terms of the lease with Prologis; 2) meeting with government and city officials to address Dow's "logistical challenges and compliance issues"; and 3) working with various experts and negotiating with Prologis to save Dow millions of dollars in the cost of necessary tenant improvements to the Premises. *Id.* at 4-5.

In late September 2018, Mohr and Prologis "began to exchange draft term sheets setting forth the material terms" of the lease ("Term Sheet"). *Id.* at 5. In the Term Sheet, the parties agreed that "Mohr was the tenant's broker and would be entitled to a commission if Mohr tendered a tenant ready, willing and able to perform that lease." *Id.* After Mohr and Prologis had negotiated all material terms of the lease, they began to exchange drafts of the lease agreement ("Lease Agreement"). *Id.* In late November 2018, the Lease Agreement was ready for final review by the parties' attorneys. *Id.* at 6.

But the parties never signed this version of the Lease Agreement. *Id.* Instead, Mohr alleges that CBRE "depriv[d] Mohr of the commission it had already earned" by "induc[ing] Dow to execute the Lease Agreement as the direct tenant." *Id.* Dow and Prologis signed a virtually identical lease agreement to the one Mohr negotiated. *Id.* The only "substantive change was that Dow was now the direct tenant (as opposed to APL) and CBRE was now the broker on both sides of the transaction." *Id.* at 7. After execution of the lease agreement, Mohr alleges that "CBRE . . . wrongfully collected the entire commission although not negotiating or procuring the material

terms of the Lease Agreement and with the intent to deprive Mohr the commission that it had earned." *Id.*

Mohr sued in this Court, alleging violations of Kentucky state law.  [DE 1].  Mohr brought five claims against CBRE: 1) tortious interference with contract; 2) tortious interference with prospective business relations; 3) unjust enrichment; 4) moneys had and received; and 5) constructive trust.  *Id.* at 8-11.  CBRE moved to dismiss these counts.  [DE 12]  Mohr responded [DE 14] and CBRE replied [DE 15].  Mohr then filed a sur-reply[1] and three exhibits: the Term Sheet, the Lease Agreement, and the lease agreement Dow entered into with Prologis  [DE 23; DE 26].

## II.   STANDARD

Federal Rule of Civil Procedure 12(b)(6) instructs that a court must dismiss a complaint if the complaint "fail[s] to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  To properly state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  When considering a motion to dismiss, courts must presume all factual allegations in the complaint to be true and make all reasonable inferences in favor of the non-moving party.  *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citation omitted).  "But the district court need not accept a bare assertion of legal conclusions."  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009)  (citation omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

---

[1] The Court granted Mohr leave to file its sur-reply.  [DE 22]

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "A complaint will be dismissed . . . if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561–64).

## III.   DISCUSSION

### A.  Count One—Tortious Interference with Contract

Mohr asserts a claim against CBRE for tortious interference with contract. [DE 1 at 8]. To state a claim for tortious interference with contract, a plaintiff must plead "(1) the existence of a contract; (2) [the defendant's] knowledge of the contract; (3) that [the defendant] intended to cause a breach of that contract; (4) that [the defendant's] actions did indeed cause a breach; (5) that damages resulted to [the plaintiff]; and (6) that [the defendant] had no privilege or justification to excuse its conduct." *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5–6 (Ky. App. 2012) (citing *Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 619 (W.D. Ky. 2009), *aff'd sub nom. Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291 (6th Cir. 2011)). In support of this claim, Mohr alleges:

13.  In connection with Prologis's efforts to lease the Premises, it designated CBRE as landlord's broker through its employee, agent, broker, and/or representative Kevin Grove, a Senior Vice President of CBRE. From the beginning, Mohr served as APL's broker (i.e. tenant broker). In connection with doing so, Mohr would be entitled to a commission from Prologis if it was successful in procuring a tenant that was ready, willing, and able to perform, *i.e.* to lease the Premises on agreed upon terms. As is industry standard, custom, and practice, and pursuant to written

4

documents exchanged between Prologis, CBRE, and Mohr, the real estate brokerage commission would be paid to Mohr by Prologis – the Landlord.

. . .

17.  By late September 2018, the parties began to exchange draft term sheets setting forth the material terms of the lease (the ***"Term Sheet"***). In the Term Sheet, all parties acknowledged and agreed that Mohr was the tenant's broker and would be entitled to a commission if Mohr tendered a tenant ready, willing and able to perform that lease:

| Real Estate Commission | Prologis recognizes Mohr Partners as Tenant's representative and agrees to pay a real estate commission per a separate written agreement. |
| --- | --- |

. . .

23.  In late November 2018, after the parties agreed to all the material and essential terms of the Lease Agreement, Mohr learned that CBRE through its employees, agents, brokers, and/or representatives encouraged and induced Dow to execute the Lease Agreement as the direct tenant.  CBRE did so with the intent to deprive Mohr of the commission it had already earned.

24.  At the insistence and encouragement of Jeffrey G. Cutler, an employee, agent, broker, and/or representative with CBRE, Dow entered into the lease directly with Prologis under the same material terms that Mohr had spent months and considerable out-of-pocket expense successfully negotiating with Prologis on APL's behalf (and, derivatively, on Dow's behalf).

. . .

27. CBRE was privy to all the material lease terms Mohr successfully negotiated by virtue of its representation of Prologis as Landlord's Broker.  CBRE encouraged Dow to execute the lease directly with Prologis under the terms that Mohr had successfully negotiated. CBRE did so to wrongfully take the approximate $850,000 commission owed to Mohr, which is exactly what CBRE did.

28. Mohr earned the commission by procuring APL as a ready, willing and able tenant of the Premises. Mohr would have received its earned commission but for CBRE's tortious interference by persuading Dow—the guarantor ultimate beneficiary of the lease—to sign the lease that Mohr negotiated in APL's stead.

. . .

31. As further alleged herein, Prologis agreed to pay Mohr a commission for procuring a ready, willing and able tenant for the Premises.

32. Mohr successfully negotiated all material terms of the Lease Agreement and procured a ready, willing, and able tenant for the leased Premises. As such, Mohr performed under its agreement with Prologis and was entitled to recover a commission from the Landlord in exchange for the services Mohr performed.

33. CBRE was fully aware of Prologis's agreement to pay Mohr a commission, as well as the services provided by Mohr, including but not limited to, negotiating and procuring the material terms of the Lease Agreement.

34. CBRE intended to and did cause a breach of Prologis's promise to pay Mohr a commission by intentionally and improperly encouraging Dow to sign the Lease Agreement as the tenant, as opposed to APL. CBRE did so after Mohr had fully performed and had earned its commission. CBRE had no legitimate privilege or justification for doing so.

35. CBRE's interference was intentional, improper, and unconscionable. CBRE did so to wrongfully claim and take the commission earned by Mohr. CBRE's intentional conduct was with malice and unjustified in law. As such, Mohr hereby seeks and is entitled to recover exemplary damages from CBRE.

36. CBRE's tortious interference with Mohr's right to receive the commission Mohr earned caused Prologis to pay the commission to CBRE, as opposed to Mohr. As such, CBRE's conduct caused Mohr to incur actual and special damages in the amount of its lost commission, out-of-pocket costs, plus attorneys' fees and exemplary damages.

[DE 1 at 4-9].

CBRE argues that Mohr's claim "fails because the Complaint does not allege a valid, enforceable contract or CBRE's knowledge of a valid, enforceable contract." [DE 12-1 at 53]. Mohr disagrees, arguing that the allegations in the Complaint establish that it had a unilateral contract with Prologis. [DE 14 at 76 ("Prologis offered to pay Mohr a commission in exchange for procuring a ready, willing and able tenant to lease the Premises" and "[t]hrough its performance, Mohr accepted that offer by successfully procuring a tenant (*i.e.* APL on behalf of Dow) . . . These terms created a quintessential unilateral contract")]. CBRE counters that Mohr has not plausibly pled the existence of a unilateral contract for a commission. [DE 15 at 110]. As

CBRE sees it, if the unilateral contract is oral, it is barred by the Statute of Frauds. *Id.*   And, if it is written, Mohr's allegations do not support its existence because Mohr "has neither produced the purported written agreement nor properly cited its essential terms." *Id.* at 112.

"A unilateral contract is formed where an offer invites acceptance and consideration in the form of performance, but does not require the offeree to make any promise in return." *Stratton v. Am. Bd. of Family Med., Inc.*, No. CIV.A. 04-144-JBC, 2005 WL 2456173, at *3 (E.D. Ky. Oct. 4, 2005)  (citing *Combs v. Int'l Ins. Co.,* 354 F.3d 568, 600 n. 18 (6th Cir.2004)).   "A 'unilateral' contract is just as valid as any other kind provided it is founded on legal consideration." *Hale v. Cundari Gas Transmission Co.*, 454 S.W.2d 680, 683 (Ky. 1970).   In the Term Sheet, which Mohr quoted in its Complaint and filed in the record, Prologis allegedly agreed "to pay a real estate commission" to Mohr.  [DE 1 at 5];  *See Mueller v. Nugent*, 187 Ky. 61, 218 S.W. 730, 733 (1920) ("Appellant insists that the contract made between Dr. Abell and the realty company was not enforceable, being unilateral; but we find no merit in this contention").   Mohr also alleges that it performed its end of the bargain by procuring a tenant for Prologis.  [DE 1 at 7].   Mohr has plausibly pled a unilateral written contract for a commission with Prologis.  *See* Restatement (Second) of Contracts § 45 (1981), cmt. g ("This Section," which deals with unilateral contracts, "frequently applies to agency arrangements, particularly offers made to real estate brokers").  Based on Mohr's allegations in its Complaint and representations in its Response, the Term Sheet satisfies Kentucky's Statue of Frauds for purposes of a motion to dismiss because it is "memorandum or note," "in writing," and "signed by the party to be charged."  Ky. Rev. Stat. Ann. § 371.010 (West); *See* Brooks Wells, Inc. v. PASW, LLC, No. 2008-CA-000312-MR, 2009 WL 1160285, at *2 (Ky. Ct. App. May 1, 2009)  ("A memorandum signed by the party to be charged

is sufficient to satisfy the statute of frauds if it relieves the court of the necessity of establishing that a contract ever existed").

Mohr has also alleged that CBRE was aware of the unilateral contract, intended to breach it, and did so. Because CBRE was Prologis' broker, it is reasonable to infer, as Mohr has alleged, that CBRE was aware of both Mohr's negotiations with Prologis and the contents of the Term Sheet. [DE 1 at 5, 7 ("In the Term Sheet, all parties acknowledged and agreed that Mohr was the tenant's broker and would be entitled to a commission . . . CBRE was privy to all the material lease terms Mohr successfully negotiated by virtue of its representation of Prologis as Landlord's Broker")]. Likewise, CBRE's intent to interfere in the unilateral contract can be inferred from its alleged decision to encourage Dow to sign directly with Prologis, thereby causing the breach of the unilateral contract. *Id.* at 6 ("At the insistence and encouragement of Jeffrey G. Cutler, an employee, agent, broker, and/or representative with CBRE, Dow entered into the lease directly with Prologis"). And Mohr has alleged that CBRE's actions resulted in Mohr not receiving its commission. *Id.* at 7 ("CBRE unjustly received the approximate $850,000 commission that was rightfully due to Mohr. Mohr has made demand to CBRE to recover the commission that Mohr rightfully earned. CBRE has refused to tender same, thus necessitating Mohr to file this lawsuit"). Finally, Mohr has alleged that CBRE had no privilege or justification for causing the breach. *Id.* at 7 ("CBRE encouraged Dow to execute the lease directly with Prologis under the terms that Mohr had successfully negotiated. CBRE did so to wrongfully take the approximate $850,000 commission owed to Mohr, which is exactly what CBRE did"). Mohr's allegations are sufficient to state a claim for tortious interference with a contract. As a result, the Court denies CBRE's motion as to this claim.

**B.**     **Count Two—Tortious Interference with Prospective Business Relations**

Mohr asserts tortious interference with prospective business relations.  [DE 1 at 9].  To state a claim for tortious interference with prospective business relations, a plaintiff must plead "(1) the existence of a valid business relationship or expectancy; (2) that [the defendant] was aware of this relationship or expectancy; (3) that [the defendant] intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages." *Snow Pallet, Inc.*, 367 S.W.3d at 6 (citing *Monumental Life Ins. Co. v. Nationwide Ret. Sols., Inc.*, 242 F. Supp. 2d 438, 450 (W.D. Ky. 2003)).

CBRE argues that Mohr's claim fails because it neither plausibly alleged "a valid expectancy to be a paid a commission by Prologis" nor  "facts showing malice, or wrongful or improper conduct on the part of CBRE."  [DE 12-1 at 55-56].  Mohr disagrees:

> Mohr alleged more than a "hope" or "wishful thinking" that a business relationship would come about.  Mohr's allegations reveal that it expended substantial efforts for more than eight months—efforts that were accepted by APL, Dow, and Prologis—to negotiate lease terms acceptable to all three parties. Compl. ¶¶ 11-26. Mohr alleges that its efforts resulted in millions-of-dollars in savings to Dow. *Id.* at ¶ 16. Mohr further alleges that in September 2018, the parties began to exchange term sheets setting forth the material terms of the lease. *Id.* at ¶ 17. In the Term Sheet, Prologis acknowledged and agreed that Mohr was the tenant's broker and would be entitled to a commission if Mohr tendered a tenant ready, willing and able to perform that lease . . . The Lease Agreement clearly acknowledges Mohr as the exclusive tenant broker and that no "other person brought about this transaction" on the tenant's side other than Mohr. *Id.* at ¶¶ 21-22. And, all the material terms that Mohr negotiated on behalf of APL (directly) and Dow (indirectly) were contained in the lease that CBRE wrongfully encouraged Dow to sign directly at the eleventh hour.  *Id.* at ¶¶ 25-26.

[DE 14 at 80].

Mohr has stated a claim for tortious interference with prospective business relations.  First, Mohr has plausibly alleged the "existence of a valid business expectancy or relationship." *Snow*

*Pallet*, 367 S.W.3d at 6.    Before CBRE allegedly interfered, Mohr and Prologis had engaged in substantial and prolonged negotiations.   [DE 1 at 5].   As part of their negotiations, they exchanged Term Sheets and a draft of a Lease Agreement.   *Id.* at 5-6.   In both the Term Sheet and the Lease Agreement, Mohr alleges that Prologis acknowledged it as APL's tenant-side broker.   *Id.* at 6.   And, in the Term Sheet, Prologis agreed to pay Mohr's commission.   *Id.* at 5.   But-for CBRE's alleged interference, Mohr has plausibly alleged that there was a "reasonable likelihood" that Mohr and Prologis would have consummated the deal because Mohr had "procured" APL to lease Prologis' property.   *See Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 621 (W.D. Ky. 2009), *aff'd sub nom. Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291 (6th Cir. 2011).   ("A valid business expectancy exists when there is 'a reasonable likelihood or a probability, not mere wishful thinking' that a business relationship will come about") (quoting *Lucas v. Monroe County*, 203 F.3d 964, 979 (6th Cir. 2000));   *Eitel v. Owen*, 284 S.W.3d 147, 148 (Ky. App. 2008)   ("[A] real estate broker is entitled to a commission where he has been the procuring cause of sale, even though the owner enters into negotiations with the person so procured and consummates the sale");   *Brooks v. Tipton*, 298 Ky. 490, 493, 183 S.W.2d 496, 498 (1944)   ("There can be no doubt that appellee was the procuring cause of the sale of appellant's land.   She procured the ultimate purchaser although during the initial negotiations he acted as the agent of another . . . Appellee started negotiations which culminated in the sale of the property to the person introduced to appellant, and there was no break in the continuity of events").

Mohr has further plausibly alleged that, CBRE, Prologis' broker, was aware of this expectancy and intentionally and improperly interfered by "induc[ing] Dow to execute the Lease Agreement as the direct tenant" after Mohr had spent more than half a year negotiating all material terms of the agreement.   [DE 1 at 6].   Mohr's reasonable expectation in receiving the commission

10

bolsters it allegation that it was unreasonable—and not merely "competitive business practices"—for CBRE to take it. Finally, Mohr has alleged that CBRE's interference caused it lose an $850,000 commission. *Id.* at 7. Because Mohr has stated a claim for tortious interference with prospective business relations, the Court denies CBRE's motion as to this claim.

## C.      Count Three—Unjust Enrichment

Mohr asserts a claim against CBRE for unjust enrichment. [DE 1 at 10]. To state a claim for unjust enrichment, a plaintiff must plead: "'(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of [that] benefit without payment for its value.'" *Furlong Dev. Co. v. Georgetown-Scott Cty. Planning & Zoning Comm'n,* 504 S.W.3d 34, 39-40 (Ky. 2016) (quoting *Jones v. Sparks,* 297 S.W.3d 73, 78 (Ky. App. 2009)).

CBRE argues that although Mohr alleges it "'conferred a benefit upon CBRE' in Count Three, that is simply not true. Mohr did not perform services on behalf of CBRE . . . Rather, as the allegations in the rest of the Complaint make abundantly clear, Mohr was working on behalf of APL and seeking to confer a benefit on APL." [DE 12-1 at 59]. Mohr see things differently: "The fact that Mohr was not acting on behalf of CBRE as CBRE emphasizes . . . is legally irrelevant. The law does not require Plaintiff to have been acting on behalf of the Defendant from whom it seeks to divulge an unjust enrichment." [DE 14 at 85].

In support of this claim, Mohr alleges:

44. Mohr incorporates by reference the preceding paragraphs as if they were fully restated herein.

45. Pleading in the alternative,[2] CBRE has been unjustly enriched at Mohr's expense.

46. Mohr conferred a benefit upon CBRE by expending significant time, effort and expense in successfully negotiating the material terms of the lease of the Premises on behalf of Dow. In contrast, CBRE did nothing of substance to procure the terms of the Lease Agreement that resulted in CBRE receiving the commission that Mohr rightfully earned.

47. CBRE has taken the benefit of Mohr's efforts by instructing and encouraging Dow to sign the lease in APL's stead – depriving Mohr of the commission it earned.

48. Allowing CBRE to retain the commission that Mohr earned would be an inequitable benefit to CBRE without payment to Mohr for the value of Mohr's services in procuring a ready, willing and able tenant of the Premises. Allowing CBRE to retain the commission that Mohr earned would be unjust.

49. As a result, Mohr has suffered and is entitled to recover damages in the amount of its lost commission, out-of-pocket costs, plus attorneys' fees and exemplary damages.

[DE 1 at 10].

Based on these allegations, it is plausible that CBRE was unjustly enriched by Mohr. Mohr has alleged that—through its diligence and industry in negotiating the lease agreement—it conferred a benefit of $850,000 on CBRE. *Id.* Mohr has further plausibly alleged that CBRE unjustly retained this benefit. *Id.* CBRE, however, asserts that § 25(1) of the Restatement (Third) Restitution and Unjust Enrichment requires more: "Mohr has not alleged a fact pattern that would trigger unjust enrichment under this provision of the Restatement." [DE 15 at 118-119]. § 25(1) provides:

---

[2] CBRE argues that although "Mohr failed to adequately allege a valid contract between Mohr and Prologis, to the extent the Court finds otherwise, the unjust enrichment claim fails because Mohr would have an adequate legal remedy against Prologis." [DE 15 at 120]. The Court disagrees: Mohr may "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8 (d)(3); *See* Fed. R. Civ. P. 8 (d)(2)("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient").

> If the claimant renders to a third person a contractual performance for which the claimant does not receive the promised compensation, and the effect of the claimant's uncompensated performance is to confer a benefit on the defendant, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment.

Restatement (Third) Restitution and Unjust Enrichment § 25(1) (2011) ("Uncompensated Performance Under Contract with Third Person"). In *Superior Steel*, the Kentucky Supreme Court relied on § 25(1) in holding that a property owner was unjustly enriched by a sub-contractor's contractual performance to the contractor. *Superior Steel, Inc. v. Ascent at Roebling's Bridge*, LLC, 540 S.W.3d 770, 779 (Ky. 2017). § 25(1) appears to apply mainly in disputes involving sub-contractors, contractors, and property owners. Indeed, the scenario considered in *Superior Steel* and the scenarios provided in comment a ("General Principles and Scope") each involve sub-contractors and contractors. *See* Restatement (Third) of Restitution and Unjust Enrichment § 25 (2011), cmt. a ("While two scenarios mentioned account for all (or nearly all) the cases allowing restitution within the rule of this section, there is nothing about their facts that would restrict the scope of the rule to such cases exclusively"). But, based on Mohr's allegations, this case does not involve sub-contractors and contractors, and so § 25(1) does not appear to be the final word on whether Mohr has sufficiently stated a claim for unjust enrichment.[3] Yet even if it were, Mohr has sufficiently alleged that it performed under its unilateral contract with Prologis, but did not receive its commission because Prologis paid it to CBRE even though CBRE did not "expend[] substantial efforts" negotiating the Lease Agreement. [DE 1 at 4-5]. Presuming all factual

---

[3] But, even assuming Mohr's allegations do not satisfy § 25(1), Mohr's claim survives because it potentially satisfies an alternative section of the Restatement, such as § 44. *See* Restatement (Third) of Restitution and Unjust Enrichment § 44 (2011) ("A person who obtains a benefit by conscious interference with a claimant's legally protected interests (or in consequence of such interference by another) is liable in restitution as necessary to prevent unjust enrichment, unless competing legal objectives make such liability inappropriate"); *Southfield Educ. Ass'n*, 570 F. App'x at 487 ("A complaint will be dismissed . . . if no law supports the claims made").

allegations in the Complaint to be true and making all reasonable inferences in Mohr's favor, Mohr

has stated a claim for unjust enrichment.[4]  *Total Benefits*, 552 F.3d at 434.  As a result, the Court

denies CBRE's motion as to this claim.

## D.  Count Five—Constructive Trust

Mohr asserts a claim against CBRE for constructive trust.  [DE 1 at 11].  Constructive trusts

"are such as are raised by equity in respect of property which has been acquired by fraud, or where,

though acquired originally without fraud, it is against equity that it should be retained by him who

holds it."  *Kaplon v. Chase*, 690 S.W.2d 761, 763 (Ky. Ct. App. 1985)  (quoting *Hull v. Simon*,

278 Ky. 442, 128 S.W.2d 954, 958 (1939))  (internal quotations omitted)

CBRE argues that the Court should dismiss this claim because a constructive trust is not a

"stand-alone claim."  [DE 12-1 at 61].  CBRE also argues that, even if it is a "stand-alone claim,"

Mohr's claim still fails because Mohr neither alleges "fraud or unconscionable conduct by CBRE"

nor a "confidential relationship with CBRE."  *Id.*  Mohr disagrees, arguing that it has sufficiently

alleged a claim for a constructive trust.  [DE 14 at 86-91].

CBRE cites a series of cases for the proposition that "[m]any courts have recognized that

a constructive trust is a remedy—not a stand-alone cause of action."  But, in these cases, the Sixth

Circuit interpreted and applied the law—not of Kentucky— but of Ohio or Michigan.  *See In re*

*Morris*, 260 F.3d 654, 668 (6th Cir. 2001)  (applying Ohio law);  *Gaymar Indus., Inc. v. FirstMerit*

*Bank, N.A.*, 311 F. App'x 814, 817 (6th Cir. 2009) (applying Ohio law);  *Smith v. Bank of Am.*

*Corp.*, 485 F. App'x 749, 755 (6th Cir. 2012)  (applying Michigan law).  Based on this precedent,

---

[4] Because Mohr has sufficiently stated a claim for unjust enrichment, it has likewise sufficiently stated a claim under Count 4 for moneys had and received.  *See Tidwell v. O'Bryan's Ad'r*, 181 S.W.2d 260, 261 (Ky. 1944) ("Unjust enrichment is the foundation" for a claim for moneys had and received).  Thus, the Court denies CBRE's motion as to that claim.

14

the Court is not persuaded that Mohr has failed to plead a claim for constructive trust under Kentucky law.

The Court is likewise unpersuaded by CBRE's argument that the claim must be dismissed because it fails to plausibly allege "fraud or unconscionable conduct" and a "confidential relationship" between Mohr and CBRE.  "[A] court exercising its equitable power may impress a constructive trust upon one who obtains legal title, 'not only by fraud or by violation of confidence or of fiduciary relationship, but *in any other unconscientious manner* so that he cannot equitably retain the property which really belongs to another[.]'"  *Keeney v. Keen*ey, 223 S.W.3d 843, 849 (Ky. Ct. App. 2007) (emphasis in original) (quoting *Scott v. Scott*, 183 Ky. 604, 210 S.W. 175, 176 (Ky. 1919)).  Mohr has plausibly alleged that CBRE obtained the commission through "any other unconscientious manner" and that it would be inequitable for CBRE to retain it.   *Id.* Specifically, Mohr has alleged:

> 21.  Consistent with the Term Sheet, the Lease Agreement clearly acknowledges Mohr as the exclusive "Tenant Broker" and CBRE (through Kevin Grove) as "Landlord's Broker" on behalf of Prologis . . .
>
> 22.  The Lease Agreement also states, "Each party represents and warrants to the other that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the Landlord Broker and Tenant Broker, if any, set forth in Paragraph 1 of this Lease."
>
> 23.  In late November 2018, after the parties agreed to all the material and essential terms of the Lease Agreement, Mohr learned that CBRE through its employees, agents, brokers, and/or representatives encouraged and induced Dow to execute the Lease Agreement as the direct tenant.  CBRE did so with the intent to deprive Mohr of the commission it had already earned.
>
> 24.  At the insistence and encouragement of Jeffrey G. Cutler, an employee, agent, broker, and/or representative with CBRE, Dow entered into the lease directly with Prologis under the same material terms that Mohr had spent months and considerable out-of pocket expense successfully negotiating with Prologis on APL's behalf (and, derivatively, on Dow's behalf).

15

[DE 1 at 6].

Next, it is unclear based on *Keeney* whether pleading a confidential relationship is a prerequisite for pleading a claim for constructive trust under Kentucky law. *Keeney* notes that a constructive trust may be imposed on one who obtained legal title either through violation of a confidential relationship or through "any other unconscientious manner." *Keeney*, 223 S.W.3d at 850. Mohr has sufficiently alleged that CBRE acted in an "unconscientious manner" by encouraging Dow to enter "into the lease directly with Prologis under the same material terms that Mohr had spent months and considerable out-of pocket expense successfully negotiating with Prologis on APL's behalf (and, derivatively, on Dow's behalf)." [DE 1 at 6]. Presuming all factual allegations in the Complaint to be true and making all reasonable inferences in Mohr's favor, Mohr has plausibly alleged an action for constructive trust. *See Game Sci., Inc. v. Gamestation, Inc.*, No. 4:14CV-00044-JHM, 2014 WL 12726643, at *10 (W.D. Ky. Oct. 21, 2014), *report and recommendation adopted*, No. 4:14CV-00044-JHM, 2014 WL 12726642 (W.D. Ky. Nov. 13, 2014) (declining to dismiss claim for constructive trust). As a result, CBRE's motion is denied as to this claim.

## IV.    CONCLUSION

For the reasons above, and being otherwise sufficiently advised, **THE COURT ORDERS AS FOLLOWS**:

(1) CBRE's Motion to Dismiss [DE 12] is **DENIED**.

(2) Mohr's Motion for Hearing and Oral Argument [DE 16] is **DENIED**.

(3) The Court will issue a separate Order for Meeting and Report pursuant to Fed. R. Civ. P. 16 and 26.

16

Rebecca Grady Jennings, District Judge

United States District Court

November 12, 2020

Copies to:    Counsel of record